**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER, | No. 22-36015 |
| *Plaintiff-Appellant*, and | D.C. No. 2:20-cv-00028-BMM |
| MONTANA RIVERS; GALLATIN WILDLIFE ASSOCIATION, | OPINION |
| *Plaintiffs*, v. | |
| RON EDWARDS, in his official capacity as Manager of the Big Sky Water and Sewer District; BIG SKY WATER AND SEWER DISTRICT; BOYNE USA, INC., | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Montana
Brian M. Morris, District Judge, Presiding

Argued and Submitted October 4, 2023
Seattle, Washington

Filed November 21, 2023

Before:  KIM MCLANE WARDLAW and MILAN D.
SMITH, JR., Circuit Judges, and KIYO A.
MATSUMOTO,[*] District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

## SUMMARY[**]

### Environmental Law

The panel affirmed in part and reversed in part the district court's judgment after a jury trial in favor of defendants in an action under the Clean Water Act.

Cottonwood Environmental Law Center filed suit against Big Sky County Water & Sewer District No. 363 and Boyne USA, Inc., for their alleged discharge of treated wastewater into the West Fork of the Gallatin River without a National Pollution Discharge Elimination System permit.  The District provides water and wastewater services for a resort community at Big Sky, Montana, and it treats and stores wastewater so that the resulting effluent can be reused for irrigation on nearby properties in Big Sky, including the golf course owned by Boyne.

Affirming in part, the panel held that the district court properly ruled, in orders denying summary judgment, that

---

[*] The Honorable Kiyo A. Matsumoto, United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Cottonwood could not advance a direct-discharge theory of liability against the District at trial. The panel held that it had jurisdiction to review the district court's orders denying summary judgment to Cottonwood because, in those orders, the district court rejected Cottonwood's direct-discharge theory as a matter of law. The panel affirmed the district court's holding that the District could not be liable on a direct-discharge theory because an underdrain pipe below but not connected to the District's holding ponds did not transfer pollutants between meaningfully distinct water bodies, and thus was not a "point source" of pollution. The panel held that, under the "meaningfully distinct water bodies" test, there is no requirement that the source water be navigable.

Reversing the district court's dismissal of Cottonwood's Clean Water Act claim against Boyne for lack of subject matter jurisdiction, and remanding, the panel held that Cottonwood's letter to Boyne provided sufficient notice of Cottonwood's indirect-discharge theory of liability.

**COUNSEL**

John P. Meyer (argued), Cottonwood Environmental Law Center, Bozeman, Montana, for Plaintiff-Appellant.

Jonathan W. Rauchway (argued), Andrea M. Bronson, Mave A. Gasaway, and Michael M. Golz, Davis Graham & Stubbs LLP, Denver, Colorado; William M. Morris (argued), Ian McIntosh, Neil G. Westesen, and Joseph M. Noreña, Crowley Fleck PLLP, Bozeman, Montana; for Defendants-Appellees.

# OPINION

M. SMITH, Circuit Judge:

This case involves alleged violations of the Clean Water Act (CWA), 33 U.S.C. § 1311(a). Plaintiff-Appellant Cottonwood Environmental Law Center (Cottonwood) filed suit against Defendants-Appellees Big Sky County Water & Sewer District No. 363 (the District) and Boyne USA, Inc. (Boyne) for their alleged discharge of treated wastewater into the West Fork of the Gallatin River (the West Fork) without a National Pollution Discharge Elimination System (NPDES) permit.

Before trial, the district court ruled that Cottonwood could not advance a direct-discharge theory of CWA liability against the District at trial. The district court also dismissed Cottonwood's claim against Boyne for lack of proper notice pursuant to 33 U.S.C. § 1365(b)(1)(A). On appeal, we affirm the district court's rejection of Cottonwood's direct-discharge theory, but reverse the district court's dismissal of Cottonwood's claim against Boyne.

## FACTUAL BACKGROUND

The District is a special purpose unit of government encompassing approximately 6,285 acres across two Montana counties. It provides water and wastewater services for a resort community at Big Sky, Montana. To manage Big Sky's wastewater, the District operates a Water Resource Recovery Facility (WRRF). The WRRF treats and stores wastewater so that the resulting effluent can be reused for irrigation on nearby properties in Big Sky, including the Meadow Village Golf Course owned by Boyne. Despite

undergoing significant treatment, the resulting effluent still retains pollutants, including nitrogen.

Because the irrigation season in Big Sky runs only from May through October, the WRRF has constructed three lined storage ponds to store treated effluent throughout the winter. The ponds hold approximately 82 million gallons of treated effluent and are lined with a high-density polyethylene liner. Despite the high-density liner, water still leaks from the WRRF storage ponds into the groundwater directly below them.

When the District added the liners to its three holding ponds, it also installed an "underdrain"—*i.e.*, a system of perforated piping that collects groundwater—beneath two of the ponds.  The underdrain pipe is not connected to the WRRF storage ponds.  Instead, it creates a preferential pathway for groundwater that naturally sits beneath the ponds, lowering the groundwater table and preventing groundwater from pushing up on—or "floating"—the pond liners.  Collected groundwater travels through the underdrain and discharges through a pipe into a small wetland near the WRRF.  The wetland is approximately 130 feet away from the West Fork.  The parties agree that the water from the aquifer below the WRRF holding ponds would reach the West Fork regardless of the existence of the underdrain pipe.  The parties also agree that water from the holding ponds, via leakage from the wastewater holding ponds and irrigation on the Meadow Village golf course, ultimately enters the West Fork.

## PROCEDURAL HISTORY

In 2020, Cottonwood sued the District in federal court for violating the CWA, which "forbids 'any addition' of any pollutant from 'any point source' to 'navigable waters'

without" an NPDES permit. *Cnty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1468 (2020) (quoting 33 U.S.C. §§ 1311(a), 1362(12)(A)). It is undisputed that the District does not hold an NPDES permit to discharge any pollutants, including from the holding ponds or the underdrain pipe, into the West Fork.

Cottonwood first moved for summary judgment on the District's liability in October 2021. Cottonwood asserted that the District violated the CWA under a direct-discharge theory—namely, that the District directly discharged nitrogen into the West Fork via the underdrain without a permit. The District opposed the motion, arguing that the underdrain is not connected to the storage ponds and that "the underdrain pipe is not adding any pollutants, but [is] merely providing a preferential path for groundwater flow." The District also cross-moved for summary judgment on the same grounds.

The district court denied both parties' motions due to the existence of genuine disputes as to material facts. The district court also cast doubt on the validity of Cottonwood's direct-discharge theory, observing that any leakage from the storage ponds would have to "move through an aquifer before reaching the . . . underdrain pipe or the West Fork." Therefore, in order to succeed in its claim, Cottonwood would need to advance an indirect-discharge theory pursuant to the Supreme Court's decision in *Maui*, which held that discharges of pollutants into groundwater eventually reaching navigable waters still require a CWA permit if such indirect discharges are the "functional equivalent of a direct discharge from the point source into navigable waters." 140 S. Ct. at 1478. Because the parties' experts disagreed about how the factors comprising *Maui*'s "functional equivalence" test applied to the discharge in question, the court ruled that

there were additional factual disputes that "must be resolved at trial."

In the same order, the district court also sua sponte granted Cottonwood "leave to amend [its] [c]omplaint . . . to include the Meadow Village Golf Course's owner, Boyne, as a party in th[e] lawsuit." The district court opined that Boyne, and not the District, was "the proper party for allegations of CWA violations that arise from discharges through the Meadow Village Golf Course's [irrigation and drainage] system."

Three days after the court issued its ruling granting leave to amend, Cottonwood sent Boyne a letter pursuant to the CWA's 60-day notice provision. *See* 33 U.S.C. § 1365(b)(1)(A). In the letter, Cottonwood alleged:

> Boyne is violating the Clean Water Act by over irrigating the Meadow Village golf course. 33 U.S.C. [§] 1311(a). Boyne's irrigation practices exceed the agronomic uptake rate of the grass, which leads to nitrogen pollution reaching groundwater and then being discharged to the West Fork . . . through several French drains as well as the underdrain pipe below the . . . District's holding ponds.

The letter further stated that "[t]he Supreme Court recently identified seven factors [in *Maui*] that help answer the question of whether Boyne's irrigation practices amount to a 'functional equivalent' of a direct discharge to the West Fork," and proceeded to explain why it believed that Boyne's conduct amounted to such a discharge pursuant to those factors. In addition to identifying "six 'drains' on the

golf course directly discharging into the West Fork," Cottonwood alleged that "[n]itrogen [was] reaching groundwater as a result of irrigating" and making its way to an "underdrain pipe," that discharged into the West Fork. Cottonwood also alleged more broadly that excessive irrigation caused "nitrogen to reach the groundwater and ultimately the West Fork." After sixty days had passed, Cottonwood filed its third amended complaint, in which it abandoned its specific allegations from the letter regarding the six drains on the golf course and focused instead on its broader allegation that Boyne's excessive irrigation—which allegedly results in nitrogen leaching into the groundwater— amounts to the functional equivalent of a direct discharge into the West Fork.

Two weeks after Cottonwood filed its third amended complaint, it again moved for summary judgment against the District on a direct-discharge theory, contending that pollution from the storage ponds discharges directly into the West Fork from the underdrain pipe. Cottonwood primarily relied on its expert's opinion that "pollutants leak from the [District's] holding ponds, enter the groundwater system below the holding ponds, and flow either to the West Fork . . . through the aquifer, or via the WRRF underdrain pipe."

The district court again denied Cottonwood's motion, which the court found to have rested "on the same facts and legal arguments . . . presented in [its] first motion for summary judgment." The district court then clarified its previous summary judgment order, explicitly stating that Cottonwood's direct-discharge theory failed as a matter of law as applied to the undisputed facts. The court reiterated, however, that Cottonwood had a triable theory of *indirect* discharge that is the "functional equivalent of a direct

discharge" pursuant to the *Maui* test.  It determined that "the WRRF holding ponds, if they leak a pollutant, qualify as a point source under the CWA."  Accordingly, Cottonwood could prevail on its CWA claim against the District if it could prove at trial that nitrogen leaked from the ponds and reached the West Fork, and that the leakage constituted the "functional equivalent of a direct discharge" from the ponds.

The district court bifurcated the trials against the District and Boyne.  At trial against the District, Cottonwood advanced its indirect-discharge theory.  It did not advance a direct-discharge theory or propose jury instructions to that effect.  After resolving objections from the parties, the district court ultimately instructed the jury that "[t]his case is about indirect discharges," that "the [D]istrict's storage ponds are a point source if they leak a pollutant," and that, although "the underdrain pipe is not a point source," the jury "may determine that the underdrain pipe contributes to an indirect discharge."  The jury returned a verdict in favor of the District, finding that the District did not violate the CWA.

Shortly after trial against the District, Boyne filed a motion to dismiss.  On November 3, 2022, the district court granted the motion for Cottonwood's lack of proper notice pursuant to 33 U.S.C. § 1365(b)(1)(A), and therefore, for lack of subject matter jurisdiction over the claim against Boyne.  Specifically, the court found that Cottonwood's notice letter "failed to identify any alleged indirect discharges of pollution" into the West Fork and instead only alleged that "several specific drains and an underdrain pipe directly discharged nitrogen pollution into the West Fork . . . ."  On December 1, 2022, the court denied a subsequent motion for leave to amend the complaint and then entered a final judgment.  Cottonwood timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.  We review de novo a district court's ruling on a summary judgment motion.  *Donell v. Kowell*, 533 F.3d 762, 769 (9th Cir. 2008).  We also determine de novo whether a district court had subject-matter jurisdiction over an action.  *Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1062 (9th Cir. 2019).

## ANALYSIS

## I.  We Have Jurisdiction to Review the District Court's Pretrial Ruling Foreclosing Cottonwood's Direct-Discharge Theory of the Case.

On appeal, Cottonwood asks us to review the district court's orders denying summary judgment to Cottonwood, in which the district court rejected Cottonwood's direct-discharge theory of the case as a matter of law.  The District contends that we lack jurisdiction to do so because orders denying summary judgment are generally not reviewable after trial pursuant to 28 U.S.C. § 1291.

As we recently observed in *Matter of York*:

> In *Ortiz v. Jordan*, the Supreme Court held that, on appeal from a final judgment after a trial on the merits, an appellate court may not review a pretrial order denying summary judgment *if* that denial was based on the presence of a disputed issue of material fact.

78 F.4th 1074, 1083–84 (9th Cir. 2023) (citing *Ortiz v. Jordan*, 562 U.S. 180, 183–84, 186–87 (2011)).  However, when an earlier ruling denying summary judgment resolved "purely legal issues—that is, issues that can be resolved

without reference to any disputed facts," then that "ruling[] . . . merge[s] into the final judgment, at which point [it is] reviewable on appeal." *Dupree v. Younger*, 598 U.S. 729, 735 (2023) ("While factual issues addressed in summary-judgment denials are unreviewable on appeal, the same is not true of purely legal issues . . . .").

In this case, when the district court clarified its rejection of Cottonwood's direct-discharge theory, the district court did so "without reference to any disputed facts" from the record. *Dupree*, 598 U.S. at 735. The parties agreed that "the groundwater beneath the WRRF [holding ponds] and the West Fork . . . represent a hydrologically connected water body," and that "the water from the aquifer below the WRRF [holding ponds] would reach the West Fork . . . regardless of the existence of the underdrain pipe." It was precisely because of these undisputed facts that the district court concluded that Cottonwood could not "argue a tenable direct discharge theory from the underdrain pipe." Therefore, the district court's foreclosure of Cottonwood's direct-discharge theory is a "pretrial legal ruling[]" and not a "factual" one. *Dupree*, 598 U.S. at 735. Because this "purely legal conclusion[] at summary judgment [was] not 'supersede[d]' by later developments in the litigation, th[e] ruling[] . . . merge[d] into the final judgment," and is therefore "reviewable on appeal." *Id.* (citations omitted).

The District's primary argument against our exercising appellate jurisdiction over the district court's pretrial legal ruling relies upon the fact that the ruling—had it gone the other way—could not have completely obviated the need for a trial. In support, the District selectively quotes dicta from our decision in *Banuelos v. Construction Laborers' Trust Funds for Southern California*, 382 F.3d 897, 902 (9th Cir. 2004), to imply a bright-line rule that we cannot exercise

appellate jurisdiction over any ruling contained within a summary judgment denial unless the ruled-upon issue "[c]ould have negated the need for a trial."

However, the Supreme Court's decision in *Dupree*—which was published shortly after Cottonwood filed its opening brief—squarely forecloses the District's all-or-nothing approach to appellate review of summary judgment denials. *Dupree* makes clear that a reviewing court may review some issues contained in a summary judgment denial, and not others. *See* 598 U.S. at 735 ("While factual issues addressed in summary-judgment denials are unreviewable on appeal, the same is not true of purely legal issues—that is, issues that can be resolved without reference to any disputed facts."). Accordingly, we have jurisdiction to review the district court's pretrial legal ruling that Cottonwood could not pursue its direct-discharge theory at trial, despite lacking jurisdiction to review other rulings contained within the same summary judgment denials.

## II. The District Court Did Not Err When It Rejected Cottonwood's Direct-Discharge Theory as a Matter of Law.

Cottonwood argues that the district court erred when it ruled that "the underdrain pipe discharging pollution was not a 'point source'" and therefore precluded Cottonwood from advancing a direct-discharge theory at trial, thereby leaving Cottonwood to pursue an indirect-discharge theory of liability, which "added extra elements to [Cottonwood's] burden of proof." In the District's view, "[t]he district court correctly rejected Cottonwood's direct-discharge theory . . . because the underdrain does not directly discharge pollutants to the West Fork as a matter of law and the undisputed facts."

We agree with the District.  Early in the litigation, Cottonwood alleged that there were two point sources of pollution under the District's control—the ponds and the underdrain.    With respect to the underdrain pipe, Cottonwood conceded that the pipe was not connected to the District's WRRF holding ponds.  Cottonwood also did not contest that "the groundwater beneath the WRRF [holding ponds] and the West Fork . . . represent a hydrologically connected water body," and that "the water from the aquifer below the WRRF [holding ponds] would reach the West Fork . . . regardless of the existence of the underdrain pipe." These undisputed facts necessarily lead to the conclusion that the underdrain pipe does not transport pollutants between "meaningfully distinct water bodies," and thus cannot constitute the discharge of a pollutant within the meaning of the CWA.  *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 111–12 (2004).

Cottonwood argues against the application of *Miccosukee*'s "meaningfully distinct water bodies" test because this case, unlike *Miccosukee*, "does not involve a transfer between navigable waters."[1]   However, the plain language of the test does not require that the source water be navigable.   As the District correctly observes, "the test examines the relationship between the source water and receiving water to determine whether the waters are 'meaningfully distinct.'"  If the source water and receiving water are not "meaningfully distinct," then the transfer between the two cannot "count[] as a discharge of pollutants

[1] The parties agree that the "water transfer rule," which excepts from the NPDES permitting requirement "activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use," does not apply in this case.  40 C.F.R. § 122.3(i).

under the CWA . . . ."  *ONRC Action v. U.S. Bureau of Reclamation*, 798 F.3d 933, 937 (9th Cir. 2015) (quoting *L.A. Cnty. Flood Control Dist. v. Nat. Res. Def. Council*, 133 S. Ct. 710, 713 (2013)).

Our decision in *Northern Plains Resource Council* is instructive on this point.  In that case, we analyzed whether water pumped from an aquifer—which is not navigable— into a navigable body of water could be considered a "pollutant" within the meaning of the CWA.  *See N. Plains Res. Council v. Fid. Expl. & Dev. Co.*, 325 F.3d 1155, 1157–60 (9th Cir. 2003).  We found that it could because without the defendant's extraction pump, water from the aquifer would never reach the navigable body of water.  *Id.* at 1158. In the words of *Miccosukee*, the water in the aquifer and the water in the navigable body of water were "meaningfully distinct," and, therefore, transfer of water from the former to the latter could constitute the discharge of a pollutant within the meaning of the CWA.  That is not the case here, where Cottonwood conceded that "the water from the aquifer below the WRRF [holding ponds] would reach the West Fork . . . regardless of the existence of the underdrain pipe." Accordingly, the district court was correct to conclude that the transfer caused by the underdrain pipe alone cannot constitute the discharge of a pollutant pursuant to the CWA.

As for the ponds themselves, the District conceded that at least some water from the WRRF holding ponds is leaking through the pond liners into the groundwater immediately below them.  The District also did not dispute that the groundwater below the ponds eventually makes its way to the West Fork, including through the underdrain pipe it installed to prevent groundwater from pushing up against the WRRF holding ponds.  In light of those facts, the district court permitted Cottonwood to proceed to trial on the claim

that the leakage of wastewater from the holding ponds into the groundwater below "cause[d] an indirect discharge of a pollutant to the West Fork" under *Maui*.  To bolster that theory, Cottonwood was also free to argue that the underdrain pipe, installed by the District, contributed to that indirect discharge by affecting the transit time, distance traveled, and the other factors relevant to whether an indirect discharge is the "functional equivalent" of a direct discharge under *Maui*.

Contrary to Cottonwood's arguments, "[t]his framework" endorsed by the district court "d[oes] not allow the District to 'exploit a loophole' in the CWA."  It is precisely because of *Maui* that the District could not argue that the leakage from its wastewater ponds was beyond the CWA's reach because the leaked water had to travel through groundwater first before reaching the West Fork.  That was the loophole *Maui* sought to close.  *See Maui*, 140 S. Ct. at 1473.  The district court therefore correctly foreclosed *Maui*'s much-feared "loophole" that would have benefited the District when it ruled that Cottonwood could still pursue an indirect-discharge theory at trial.

Cottonwood offers several other arguments, but none overcomes its concession that the wastewater leaking from the WRRF holding ponds must travel through natural groundwater first before reaching the West Fork.  These factual circumstances squarely call for the application of *Maui*, which provides a pathway to CWA liability so long as "the addition of . . . pollutants through groundwater is the functional equivalent of a direct discharge from the point source into navigable waters."  140 S. Ct. at 1468, 1477.  Accordingly, the district court correctly concluded that Cottonwood could argue an indirect-discharge theory

pursuant to *Maui*, but not a direct-discharge theory in light of *Miccosukee*'s "meaningfully distinct water bodies" test.

## III. The District Court Erred When It Dismissed Cottonwood's Claim Against Boyne for Lack of Proper Notice.

Cottonwood also appeals the district court's dismissal of its CWA claim against Boyne for lack of proper notice and therefore subject matter jurisdiction. Boyne contends dismissal was correct because, according to Boyne, the indirect-discharge theory of excess nitrogen leaching into the groundwater due to overirrigation and eventually making its way to the West Fork did not appear at all in Cottonwood's notice of its intent to sue.

For a federal court to exercise subject matter jurisdiction over a private CWA claim, the individual or entity bringing the claim "must give a 60-day notice of intent to sue. In fact, absent that notice, the action is prohibited," as "it is a jurisdictional necessity." *Ctr. For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009) (as amended) (citing 33 U.S.C. § 1365(b)(1)(A)). Such notice must include:

> sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation,

and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). "Notice is sufficient if it is specific enough to give the accused company the opportunity to correct the problem." *S.F. BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1158 (9th Cir. 2002) (internal quotation marks omitted). "We have sometimes been slightly forgiving to plaintiffs in this area, but even at our most lenient we have never abandoned the requirement that there be a true notice that tells a target precisely what it allegedly did wrong, and when," *Ctr. For Biological Diversity*, 566 F.3d at 801, with "reasonable specificity," *Baykeeper*, 309 F.3d at 1158 (quotation omitted).

Cottonwood's letter to Boyne provided more than sufficient notice of Cottonwood's indirect-discharge theory of liability. The very first sentence of the letter states that "Boyne is violating the Clean Water Act by over irrigating the Meadow Village golf course. 33 U.S.C. [§] 1311(a)." The letter also discusses the "seven [*Maui*] factors that help answer the question of whether Boyne's irrigation practices amount to a 'functional equivalent' of a direct discharge to the West Fork"—*i.e.*, an indirect discharge—and explains why Boyne's conduct amounted to such a discharge pursuant to those factors. Despite the letter alleging the existence of several drains directly discharging into the West Fork— allegations Cottonwood would later abandon in the complaint—the letter also alleged that excessive irrigation caused "nitrogen to reach the groundwater and ultimately the West Fork," regardless of the drains. For instance, the letter discussed the hydraulic conductivity of the West Fork's watershed and how that enables nitrogen pollution to make

its way to riparian zones and streams that directly flow into the West Fork.

Accordingly, Cottonwood did not "change[] course" and offer "materially distinct allegations" when it alleged in its third amended complaint that Boyne's irrigation practices amounted to an indirect discharge of nitrogen into the West Fork, as Boyne suggests. Cottonwood simply abandoned specific allegations regarding the drains but continued to press other, specific allegations regarding nitrogen leaching into the groundwater through over-irrigation. Therefore, the district court erred when it dismissed Cottonwood's claim against Boyne for lack of proper notice.[2]

However, Boyne argues that other grounds exist to affirm the dismissal of Cottonwood's claim against Boyne, regardless of whether notice was adequate. Chief among them is Boyne's argument that the district court violated the party presentation principle, which requires that courts "rely on the parties to frame the issues for decision" and play "the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Boyne argues that the district court violated this principle when it sua sponte granted Cottonwood leave to amend the pleadings after the deadline to amend the pleadings had passed, so that Cottonwood could "include the Meadow Village Golf Course's owner, Boyne, as a party to this lawsuit."

---

[2] Boyne also argues that Cottonwood's letter was "conspicuously silent as to the 'date or dates of such violation,' as the regulations require." The district court did not address this alleged deficiency, but the notice letter appears to contain sufficient information to put Boyne on notice of such dates. *Cf. Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951–53 (9th Cir. 2002); *Baykeeper*, 309 F.3d at 1158–59.

The district court's actions do not amount to an abuse of discretion. As Cottonwood correctly observes, the district court never required Cottonwood to add Boyne as a defendant. While other district courts may have taken a more passive approach upon concluding that Boyne, and not the District, was "the proper party for allegations of CWA violations that arise from discharges through the Meadow Village Golf Course's [irrigation] system," the district court's "modest initiating role" in suggesting that Cottonwood join Boyne to the litigation was likely "appropriate." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). None of the authorities provided by Boyne suggest otherwise, as they are readily distinguishable on their facts. Accordingly, the district court did not violate the party presentation principle.

Boyne also asks us to affirm the dismissal because "[t]he CWA explicitly excepts 'discharges composed entirely of return flows from irrigated agriculture' from the statute's . . . permitting requirements," and because Cottonwood otherwise fails to state a claim upon which relief may be granted. We decline to reach these merits-issues in the first instance. *See Detrich v. Ryan*, 740 F.3d 1237, 1248–49 (9th Cir. 2013) (noting that it is "standard practice . . . to remand to the district court for a decision in the first instance without requiring any special justification for so doing"). Accordingly, the dismissal of Cottonwood's claim against Boyne for lack of subject matter jurisdiction is reversed.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment in favor of the District but **REVERSE** the dismissal of Boyne. We **REMAND** this case to the district court for further proceedings consistent with this opinion.

Cottonwood shall bear the District's costs on appeal, and Boyne shall bear Cottonwood's costs in appealing the district court's dismissal of Boyne. *See* Fed. R. App. P. 39(a).